**Guilliaem AERTSEN et al.,
Plaintiffs, Appellants,**

v.

**Moon LANDRIEU, etc. et al.,
Defendants, Appellees.**

No. 80–1206.

United States Court of Appeals,
First Circuit.

Argued Sept. 9, 1980.

Decided Dec. 11, 1980.

Thomas B. Bracken, Boston, Mass., with whom J. Raymond Miyares and Bracken & Baram, Boston, Mass., were on brief, for plaintiffs, appellants.

Carolyn S. Grace, Asst. U. S. Atty., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for defendants, appellees.

Jeffrey Swope, Boston, Mass., with whom Palmer & Dodge, Boston, Mass, was on brief, for appellee E.T.C. Development Corp.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, WYZANSKI, Senior District Judge.*

WYZANSKI, Senior District Judge.

This appeal raises questions as to whether in committing funds to finance a proposed housing project the United States Department of Housing and Urban Development (HUD) violated the National Environmental Policy Act of 1969 (NEPA), 83 Stat. 852, 42 U.S.C. § 4321 *et seq.*, or the Housing and Community Development Act of 1974 (the 1974 Housing Act), 88 Stat. 633 *et seq.*, 42 U.S.C. § 5301 *et seq.*, or regulations thereunder.

On December 21, 1978 the plaintiffs, residents of the South End of Boston, filed in the district court a complaint against the Secretary of the United States Department of Housing and Urban Development (HUD) and the Director of the Boston Redevelopment Authority (BRA). It alleged that HUD had committed funds to finance a proposed housing project known as Viviendas La Victoria (Victoria II) in the South End of Boston without complying with cer-

* Of the District of Massachusetts, sitting by designation.

tain provisions of NEPA and the 1974 Housing Act and regulations thereunder. The plaintiffs chiefly[1] complained that HUD had violated § 102(2)(C) of NEPA, 83 Stat. 853, 42 U.S.C. § 4332(2)(C) by not making with respect to Victoria II an Environmental Impact Statement (EIS), had violated § 102(2)(E)[2] of NEPA, 83 Stat. 853, 42 U.S.C. § 4332(2)(E) by not studying, developing and describing appropriate alternatives to Victoria II, and had violated one of the purposes of the 1974 Housing Act set forth in § 101(c)(6) of that act, 88 Stat. 634–635, 42 U.S.C. § 5301(c)(6) and had violated regulations under that act, 24 C.F.R. § 800.112(c) and (d), recodified in 24 C.F.R. § 880.206(c) and (d). The complaint sought, in addition to a declaratory judgment, temporary and permanent injunctions to restrain the Secretary of HUD from financing Victoria II and to restrain the Director of BRA from taking demolition or other action in connection with the construction of Victoria II.

Jurisdiction of this case exists under the "federal question" provisions of 28 U.S.C. § 1331. *Silva v. Lynn,* 482 F.2d 1282, 1283 (1st Cir. 1973) and also under the Administrative Procedure Act §§ 702, 706. *Ibid.* See *Strycker's Bay Neighborhood Council v. Karlen,* 444 U.S. 223, 226, 100 S.Ct. 497, 499, 62 L.Ed.2d 433 (1980); *Kleppe v. Sierra Club,* 427 U.S. 390, 394 n.2, 96 S.Ct. 2718, 2722 n.2, 49 L.Ed.2d 576 (1976); *Citizens To Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

The parties on February 13, 1978 filed an Agreed Statement of Facts and a stipulation with respect to 78 documents which the parties asserted "comprise the administrative record in this case." The district court limited the additional evidence to testimony with respect to the relations between the defendants. In that court no party objected to any order limiting evidence, or moved to vacate any order or judgment on the ground that the court failed to afford a party an opportunity to present evidence.

The district court on March 27, 1979 filed an opinion, reported as *Aertsen et al. v. Harris,* 467 F.Supp. 117 (D.Mass.1979), containing findings which, so far as now material, were to the following effect.

In 1965, the Boston Redevelopment Authority of the City of Boston ("BRA") adopted the South End Renewal Plan ("The Plan"), which includes Reuse Parcel 19 Nos. 19A, 19B, 19C, PB–6, PB–7, PB–8, PB–11, R–6, R–6A and P–16 consisting of about 34 acres bounded generally by Tremont, Upton, Washington and West Newton Streets. The Plan aims at the rehabilitation of the area on an integrated basis both racially and economically and provides for the acquisition, clearance, and redevelopment of parcels within the area. In August, 1966 HUD approved the Plan by executing a Loan and Capital Grant Contract ("the Contract") with the BRA.

In 1969, BRA tentatively designated as the developer of Parcel 19 (heretofore described as Parcels 19A, 19B, and 19C) ETC Development Corp. (ETC), a business corporate affiliate of Inquilinos Boricuas en Accion, Inc. (IBA). IBA is a nonprofit, principally Hispanic, community development corporation, with the purpose of providing housing in the South End for low-income persons who would otherwise have been displaced by the Plan. ETC made a five-phase proposal: a residence for the elderly, two rehabilitation projects, and two housing projects for low-and middle-income families on land acquired from BRA.

Before 1976 HUD furnished financial assistance (a) to BRA for clearance and rede-

---

1. The complaint had six counts. Four counts refer to statutes and an executive order which are not involved in this appeal. Only count I and part of count II are printed in the record appendix or relied upon in the plaintiffs' brief. Those counts do not point precisely to plaintiff's claims, refer to many irrelevant matters, and do not even cite 24 C.F.R. § 800.112(d) upon which plaintiffs' brief rests one of its principal arguments. We believe that our recital of the gist of the complaint tracks the plaintiffs' brief and fairly discloses their claims.

2. § 102(2)(E) of NEPA was originally § 102(2)(D), but a redesignation was effectuated by Pub.L. 94–83, 89 Stat. 424.

velopment, and (b) to ETC for (1) construction of a 201 unit high-rise residence for the elderly, known as "Unidad Torres," (2) rehabilitation of 71 housing units on Tremont Street, (3) rehabilitation of 36 housing units, known as "Casas Boriquen," and (4) construction of 181 family housing units, known as "Viviendas la Victoria I."[3]

Because it lacked funds in 1976, HUD then had no expectation of financing the fifth phase of ETC's proposal—that is, a second housing project to be known as "Viviendas la Victoria II."[4]

However, in fiscal year 1977 funds became available to HUD's Boston Area office for projects under § 8 of the United States Housing Act of 1937, as amended by title II of the Housing and Community Development Act of 1974, 88 Stat. 633, 662–666. In response to HUD's Notification of Fund Availability No. MA 06–0003, issued in April 1977, ETC submitted on June 15, 1977 a Preliminary Proposal to HUD for federal financial assistance to construct and operate the fifth phase of its original 1969 proposal: that is, a second housing project for low-and middle-income families.

That proposal is for a 207-unit housing project, to be known as Victoria II. It is to be built by ETC with financial assistance from HUD and on land acquired and provided by BRA principally on PB–8 and 19–B, between West Newton and West Brookline Streets on the west side of Victoria I, and on R–6, R–6A, and PB–6, on West Dedham Street on the east side of Victoria I and Unidad Torres.[5]

As part of its consideration of that proposed project, HUD, pursuant to its regulations, prepared a Special Environmental Clearance (SEC) statement, dated July 21, 1978. It consists of a 4-page check-list, a 10-page narrative summary, and 14 appendices set forth in over 100 pages.[6] The SEC check-list states that HUD "determined that the completion of this project will not have any significant impact on the environment. Some of the anticipated residents will be from the surrounding environs. Therefore, it is not expected that there will be any influx into this area." The SEC narrative summary concluded that "it is not expected that the construction of Phase II of Viviendas la Victoria will have a significant impact on the South End nor change the community structure." The July 21, 1978 SEC, while it considered the environmental impacts of the construction of Victoria II, did not consider the environmental impacts of the demolition and site preparation necessary for that construction.[7]

On the basis of the July 21, 1978 SEC, HUD on August 3, 1978 approved ETC's preliminary proposal and reserved $1,444,-596 in annual rental subsidy contributions for Victoria II. As a result of that approval, ETC in November, 1978 applied to HUD for project mortgage insurance to enable ETC to obtain financing for Victoria II at an estimated construction cost of $8,445,000. On November 30, 1978 the Board of Directors of the BRA authorized the advertisement for a demolition and site clearance contract relative to the 15 buildings existing on the site for Victoria II. See footnote

**3.** It appears from *Chick v. Hills*, 528 F.2d 445, 448, col. 2, par. 1 (1st Cir. 1976) but not in the district court's March 27, 1979 findings in the instant case that up to 1976 HUD had not adopted the fifth or Victoria II phase of ETC's proposal.

**4.** This paragraph recites what is not in dispute. However, it is based not on Judge Caffrey's March 27, 1979 findings, but on *Chick v. Hills*, *supra*.

**5.** The proposal originally contemplated the demolition of fifteen buildings, eight of which are located within the South End Historic District. However, in the course of proceedings in this case in the district court, it has been

agreed that those eight buildings will not be demolished but will be rehabilitated. The decision to demolish the remaining seven buildings on the project site is not in issue on this appeal.

**6.** Our summary of the July 21, 1978 SEC is somewhat fuller than, but consistent with, Judge Caffrey's summary.

**7.** The reason for the omission was that HUD understood that demolition and site preparation undertaken by the BRA without federal funding was a separate BRA action for which NEPA did not require that HUD should prepare an environmental impact statement.

5, *supra.* On December 19, 1978 BRA publicly advertised for bids to be received by January 10, 1979 for demolition of the existing buildings.

On March 27, 1979 the district court for reasons given in *Aertsen et al. v. Harris, supra,* temporarily enjoined HUD and BRA from demolition of the buildings now standing on the proposed site of Victoria II "pending the completion" of HUD's July 21, 1978 SEC so as to include the environmental impact of the demolition. On December 5, 1979 HUD filed a "Motion to Vacate Injunction of March 27, 1979 And To Dismiss." Attached was a Supplement, prepared November 1, 1979, to HUD's July 21, 1978 SEC. In substance, the motion was one for summary judgment. See the last sentence of F.R.Civ.P. 12(b). Cf. *Karlen v. Harris,* 590 F.2d 39, 42, col. 1, ll. 7–8 (2nd Cir. 1978), *rev'd on other grounds sub nom. Strycker's Bay Neighborhood Council v. Karlen,* 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980). The only affidavits the plaintiffs filed in opposition to the motion did not show that there was a "genuine issue as to any material fact."[8]

Following the order of the counts of the complaint rather than the order of points in the brief, we consider, in turn, the plaintiffs' contentions that HUD's commitment of funds violates subsection (C) and subsection (D) of § 102(2) NEPA and the preamble of the 1974 Housing Act and HUD regulations pursuant thereto.

### I. *The Plaintiff's NEPA Contentions.*

The plaintiffs contend that HUD was arbitrary and capricious in determining that Victoria II was not, within the meaning of § 102(2)(C) of NEPA, a major federal action significantly affecting the quality of the human environment (hereafter "major ac-

tion") for which, before committing funds, HUD was required to prepare an EIS.

We begin with a general description of the setting in which the plaintiffs' contention arises. § 102(2)(C) of NEPA, 83 Stat. 853, 42 U.S.C. § 4332(2)(C) directs that, to "the fullest extent possible: . . . (2) all agencies of the Federal Government shall . . . (C) include in . . . major Federal actions significantly affecting the quality of the human environment, a detailed statement [EIS] by the responsible official on . . . (i) the environmental impact of the proposed action." HUD, as "the responsible official," is the party charged with the duty of determining whether the proposed action is major and significantly affects the environment. Cf. *Strycker's Bay Neighborhood Council v. Karlen, supra,* 444 U.S. at 223, 224–225, 100 S.Ct. 497, 499, 62 L.Ed.2d 433; *Hanly v. Mitchell,* 460 F.2d 640, 644 (2nd Cir.), *cert. denied,* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972). The Council on Environmental Quality (CEQ) is an advisory body established by Title II of NEPA, 42 U.S.C. §§ 4341–47, which has authority to promulgate guidelines to aid "responsible officials" to develop their own procedures for identifying actions.

In light of CEQ guidelines, HUD established procedures for identifying major actions. HUD Circular FW 1300.2 (March 1, 1971), superseded by HUD Circular 1390.1 (July 16, 1971). Those procedures, approved on September 21, 1971 by CEQ General Counsel, as noted in *Hiram Clarke Civic Club, Inc. v. Lynn,* 476 F.2d 421, 424–425 (5th Cir. 1973), provided that where a proposed action *may* be a major action, the local HUD office shall make a Special Environmental Clearance (SEC) study which shall result in either (a) a "negative statement" indicating that the action would

---

**8.** The plaintiffs on December 17, 1979 filed the affidavits of Alexander Cassie, an architectural historian, and Leslie Larson, an architectural designer, setting forth facts from which they drew the conclusion that it was essential to the historic preservation of the South End that there should not be a demolition of certain buildings on the proposed site of Victoria II. However, at page 4 of its November 1, 1979 Supplement HUD specifically determined that

those buildings were "not of historic significance." Hence the affidavits were immaterial because offered to prove that HUD made a substantive, not a procedural, error, and thus they were directed to the impermissible object of having the district court "second guess the wisdom of the agency's policy choice." *Grazing Fields Farm v. Goldschmidt,* 626 F.2d 1068, 1072 n.2 (1st Cir. 1980).

have no adverse effect on the environment or (b) an EIS pursuant to § 102(2)(C) of NEPA.

Following those procedures, HUD in the case at bar made its July 21, 1978 SEC and its November 1, 1979 Supplement thereto, resulting in a "negative statement." The plaintiffs filed the complaint in the instant case to seek a review of that "negative statement" determining that an EIS is unnecessary because Victoria II is not a major action.

The district court reviewed the determination upon the basis of HUD's administrative record including the July 21, 1978 SEC and the November 1, 1979 Supplement, and concluded that HUD had not been arbitrary, capricious, or unreasonable in determining that Victoria II was not a major action, but, on the contrary, that its determination "is well documented and adequately considers the various environmental impacts which La Victoria II will have."

We now turn to the specific grounds asserted by plaintiffs as a basis for setting aside the district court's conclusion that HUD was not arbitrary in determining that Victoria II was not a major project.

■ The plaintiffs contend that the district court precluded them from offering testimony which plaintiffs do not describe except to say that it shows that Victoria II was a major action. We reject the contention. In the district court the plaintiffs failed to proffer the testimony or to object to the district court's preclusion order when it was made, or when its effect was plainly visible in the district court's March 31, 1980 opinion and order, or at any other time. In this court the plaintiffs have not shown what is the precise nature of the testimony they had available in the district court. We have no reason to suppose that the testimony was of that character which would have been admissible as showing that the SEC statement had failed to consider serious environmental consequences of Victoria II or had failed to discuss some reasonable alternative to the project. *County of Suffolk v. Secretary of the Interior*, 562 F.2d 1368, 1385 (2nd Cir. 1977). In the absence of

special circumstances, which have not here been shown, the district court was warranted in deciding this case upon the basis of the administrative record. *Hiram Clarke Civic Club, Inc. v. Lynn*, 476 F.2d 421, 425 (5th Cir. 1973).

■ The plaintiffs contend that HUD made its determination that Victoria II did not significantly affect the quality of the human environment without taking into account the CEQ guidelines. However, the plaintiffs have misconceived the function of CEQ guidelines. "Guidelines are merely advisory and the Council on Environmental Quality has no authority to prescribe regulations governing compliance with NEPA." *Greene County Planning Board v. FPC*, 455 F.2d 412, 421 (2nd Cir.) *cert. denied* 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972); *Hiram Clarke Civic Club, Inc. v. Lynn*, 476 F.2d 421, 423–424 (5th Cir. 1973).

■ Moreover, in the instant case HUD's July 21, 1978 SEC together with the November 1, 1978 Supplement thereto did in fact take into account the guideline suggestions to which plaintiffs' brief refers. Plaintiffs point out that the guidelines suggest that in order to determine whether a major federal action significantly affects the quality of the environment, it is appropriate to consider, *inter alia*, whether the proposed action relates to an area characterized by "proximity to historic or cultural resources" (40 C.F.R. § 1508.27(3)), "the degree to which the effects on the quality of the human environment are likely to be highly controversial" (40 C.F.R. § 1508.-27(4)), and "whether the action is related to other actions with individually insignificant but cumulatively significant impacts" (40 C.F.R. § 1508.27(7)). In response to the first of those suggestions, the November 1, 1979 Supplement reported that "the HUD Area Office Environmental Officer, the Massachusetts Preservation Officer and the National Advisory Council have concurred in the opinion that the development as presently proposed will have no effect on the South End Historic District." In response to the second of those suggestions, the July

21, 1978 SEC, under the heading "Social Fabric and Community Structures," found that all the diverse people who live in the South End support the proposition "that housing is needed," and that the only controversy is for what income and racial groups it should be provided. In response to the third of those suggestions, the July 21, 1978 SEC check-list shows that HUD specifically stated that the proposed Victoria II project did "form part of a larger development pattern," and that "the cumulative environmental impact of the larger development should be addressed" by the July 21, 1978 SEC rather than by an EIS.

The plaintiffs contend that quite apart from the CEQ guideline, there were compelling reasons why HUD should have determined that Victoria II was a major action for which an EIS statement was necessary.

█ In essence the argument is that the 207 units in Victoria II should be added to 489 earlier-constructed units and HUD should have considered the almost 700-unit total as a major action, for which an EIS must be made. The district court rejected this argument for the following reasons:

In this case there is no indication that HUD segmented the Parcel 19 project with a "conscious design to circumvent the requirements of NEPA as would amount to bad faith." *Ogunquit Village Corp. v. Davis,* 553 F.2d 243, 246 (1st Cir. 1977). HUD was allowed by the Court of Appeals to segment an earlier phase of the Parcel 19 project, La Victoria I, because there was no reasonable expectation of further federal financing "as the subsidized housing program had been discontinued." *Chick v. Hills,* 528 F.2d 445, 448 (1st Cir. 1976). It was only after funds again became available in 1977 that the developer applied for and received funding for La Victoria II. Since the basic function of an EIS is to serve as a forward-looking instrument to assist in evaluating "proposals" for major federal action, *Kleppe v. Sierra Club,* 427 U.S. 390, 406, 410 n.20, 96 S.Ct. 2718, 2730 n.20, 49 L.Ed.2d 576 (1976), I decline, absent a showing of bad faith, to require an EIS as an after-the-fact justification for a multi-phase development already substantially completed. Any incremental effects of the La Victoria II phase have already been adequately assessed in the SEC, as supplemented.

We are in accord with the foregoing conclusion of the district court. While it is true that in 1969 ETC made a five-phase proposal of which the construction of Victoria II was expected to be the last phase, that last phase was aborted in 1976 in good faith for lack of funds. HUD did not then contemplate further construction. Although ETC's 1977 application for funds was in substance the same as the fifth phase of its 1976 proposal, it was a new proposal by ETC calling for a new action by HUD. HUD's obligation was to determine not whether the earlier action together with the proposed action constituted a major action significantly affecting the human environment, but whether in light of the earlier action the proposed action constituted such an action. *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n.20, 414–415 n.26, 96 S.Ct. 2718, 2730 n.26, 49 L.Ed.2d 576 (1976). The July 21, 1978 SEC shows an awareness of that obligation resting upon HUD, for the SEC acknowledges that "the cumulative environmental impact of the larger development should be addressed." That the obligation was fulfilled is shown by the 4 check-list pages, the 10 narrative pages, and the many addenda of the SEC.

█ We, therefore, agree with the district court's conclusion that Victoria II was not a major federal action significantly affecting the human environment. Whether we would reach the same conclusion *de novo* is immaterial, for on review of an HUD determination that a proposed project does not constitute a major action the judicial function is merely to decide whether HUD has followed a permissible procedure and has reached a substantive conclusion which is not arbitrary. See *Grazing Fields Farm v. Goldschmidt, supra.*

The plaintiffs' next principal contention is that HUD has failed to comply with what

is now § 102(2)(E)—formerly § 102(2)(D)—of NEPA, 83 Stat. 853, as amended by 89 Stat. 424, 42 U.S.C. § 4332(2)(E), which provides that "to the fullest extent possible . . . all agencies of the Federal government shall . . ."

> (E) study, develop, and describe appropriate alternatives to recommend courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

The foregoing obligation to describe alternatives is not limited to a proposed major action significantly affecting the human environment, for otherwise it would add nothing to § 102(2)(C)(iii) of NEPA which already imposed an obligation upon a Federal Government agency to make with respect to a proposed major action a statement of "alternatives to the proposed action." *Trinity Church Episcopal Corporation v. Romney*, 523 F.2d 88, 93 (2nd Cir. 1975); s.c. sub. nom. *Karlen v. Harris*, 590 F.2d 39 (2nd Cir. 1978); rev'd on other grounds. *Strycker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 443 (1980). *Environmental Defense Fund, Inc. v. Corps of Engineers*, 492 F.2d 1123, 1135 (4th Cir. 1974); *City of New York v. United States*, 337 F.Supp. 150, 158 (S.D.N.Y.1972) (per Friendly, C. C. J.).

█ Yet the § 102(2)(E) obligation extends only to a proposal that has a certain magnitude,[9] *Trinity Episcopal Corporation v. Romney, supra*, and is controversial. The text of § 102(2)(E) confines the obligation to a "proposal which involves unresolved conflicts concerning alternative uses of available resources." In connection with a commitment of funds to finance the development of a parcel of land, the "parcel of land" constitutes the "resources." There is nothing in the text, the legislative history known to us, nor the policy and purposes of NEPA to justify an interpretation of "resources" to include the funds to be expended by the federal agency. Such an interpretation would go in quite a different direction from the declared purposes [10] of NEPA, inasmuch as its focus would be not on whether a project harmonizes with and avoids damage to the environment where it is proposed to locate it, but on whether there is a more suitable location or project on which the government could spend its money. The latter raises what are primarily non-environmental questions. We therefore, conclude that § 102(2)(E) of NEPA does not impose upon HUD the duty of studying, developing and describing other uses it could have made of the funds it has committed to Victoria II.[11]

---

**9.** We assume, without deciding, that HUD's action in financing Victoria II is an action of such magnitude, whether measured in dollars or in number of housing units to be constructed, as to subject it to § 102(2)(E) of NEPA. See *Trinity Episcopal School Corporation v. Romney, supra.*

**10.** § 2 of NEPA, 83 Stat. 852, 42 U.S.C. § 4321 provides:

> The purposes of this Act are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

**11.** Plaintiffs' contrary view erroneously relies on *Trinity Episcopal School Corp. v. Romney, supra* and *King v. Harris*, 464 F.Supp. 827 (E.D.

N.Y.), aff'd No. 79–7144 (2nd Cir. 1978). In each of those cases the court construed a now-repealed HUD regulation (38 F.R. 19193, July 18, 1973, eliminated November 1974) which required the agency to consider alternative sites for which HUD might use its available funds. Those cases are not authority for the proposition that § 102(2)(E) of NEPA requires HUD to study and describe alternative uses of its funds. While *Strycker's Bay Neighborhood Council v. Karlen, supra*, refers to HUD's consideration of the potential alternative use of the funds involved in *Trinity Episcopal School Corp., supra, s.c. Karlen Harris*, 590 F.2d 39 (1978) for sites other than the one chosen by HUD the Supreme Court did not hold that § 102(2)(E) of NEPA imposed upon HUD a duty to consider such alternative uses of its funds. Indeed the Supreme Court indicated the opposite when at p. 228 it stated that "HUD considered the environmental consequences of its decision to redesignate the proposed site for low-income housing. NEPA required no more."

With respect to alternative uses of Parcel 19, HUD, in its July 21, 1978 SEC and its November 1, 1979 Supplement, recognized that the site was suitable for housing purposes and described the conflict as to whether the site should be left as it was or used for low-cost housing. HUD did not discuss the purely hypothetical use of the site for high-cost housing, stores, schools, churches, parks, or other purposes. But no one had made a realistic proposal for such other purpose. Thus the only unresolved conflict concerning an alternative to Victoria II as a use of Parcel 19 was a continuation of the *status quo*. That alternative HUD plainly considered. The department had no obligation to go further, and to consider alternatives which were not "realistic" and were purely "hypothetical".[12]

## II. *The Plaintiffs' Contentions Based on the 1974 Housing Act and the Regulations Thereunder.*

We first address the plaintiffs' contention that in committing funds to finance Victoria II HUD violated provisions of the Housing and Community Development Act of 1974 itself, as distinguished from some regulations thereunder.

12. If HUD had been required to file an EIS, its duty under § 102(2)(C)(iii) would have been to consider only "realistic alternatives that will be reasonably available within the time the decision-making official intends to act." *Fayetteville Area Chamber of Commerce v. Volpe,* 515 F.2d 1021, 1027 (4th Cir. 1975) *cert. denied,* 423 U.S. 912, 96 S.Ct. 216, 46 L.Ed.2d 140 (1975), not to include alternatives that are fanciful, hypothetical, or not within a rule of reason. *Grazing Fields Farm v. Goldschmidt, supra,* p. 1074. HUD's duty under § 102(2)(E) is no greater.

13. The "Housing and Community Development Act of 1974," Act of August 1974, Pub.L. 93–383, 88 Stat. 633, provided in Title I, 88 Stat. 633–653, for "Community Development," in Title II, 88 Stat. 653–676, for "Assisted Housing," in Title III, 88 Stat. 676–686, for "Mortgage Credit Assistance," in Title IV, 88 Stat. 686–692, for "Comprehensive Planning," in Title VI, 88 Stat. 700–714, for "Mobile Home Construction and Safety Standards," in Title VII, 88 Stat. 714–721, for "Consumer Home Mortgage Assistance," and in Title VIII, 88 Stat. 721–741, for "Miscellaneous Matters."

In 1974 Congress enacted the "Housing and Community Development Act of 1974," Act of August 22, 1974, Pub.L. 93–383, 88 Stat. 633. Its seven titles[13] covered the different aspects of federal financing of housing. Title I, entitled "Community Development," was concerned principally with grants to States and units of local government. See § 103(a)(1), 88 Stat. 637, 42 U.S.C. § 5303(a)(1). Title II entitled "Assisted Housing," amended the entire text of the United States Housing Act of 1937, Act of September 1, 1937, Pub.No. 412, 50 Stat. 888, and provided, *inter alia,* in § 8 for "Lower-Income Housing Assistance." 88 Stat. 662–666, 42 U.S.C. § 1437f.

Pursuant to § 8 of the amended text of the United States Housing Act of 1937, as set forth in Title II, § 201(a) of the Housing and Community Development Act of 1947, 88 Stat. 662–666, 42 U.S.C. § 1437f, HUD made the Victoria II commitment. The plaintiffs do not allege that HUD violated any provision of § 8. Their claim is that HUD made a commitment which is in violation of both Title I, § 101(c)(6)[14] of the "Housing and Community Development Act of 1974," 88 Stat. 633, 634–635, 42 U.S.C.

14. Title I, § 101(c) of the Housing and Community Development Act, 88 Stat. 634–635, 42 U.S.C. § 5301(c) provides:

(c) The primary objective *of this title* is the development of viable urban communities, by providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income. Consistent with this primary objective, the *Federal assistance provided in this title* is for the support of community development activities which are directed toward the following specific objectives—..... (emphasis added)

(6) the reduction of the isolation of income groups within communities and geographical areas and the promotion of an increase in the diversity and vitality of neighborhoods through the spatial deconcentration of housing opportunities for persons of lower income and the revitalization of deteriorating or deteriorated neighborhoods to attract persons of higher income: ....

§ 5301(c)(6) and Title I, § 104(a)(4)(C)(ii) of that act,[15] 42 U.S.C. § 5304(a)(4)(C)(ii).

In their briefs both parties have assumed that Title I § 101 and Title I § 104 apply to HUD's Victoria II commitment. We shall only for present purposes make the same assumption because we have not heard argument to the contrary. But we feel bound to state that if, as we understand to be the case, the only financial involvement of HUD in Victoria II is a commitment authorized by § 8 which appears as part of Title II § 201(a) of the 1974 Act, we fail to see how § 101 or § 104 of Title I of that act has any bearing on the case at bar. The objectives listed in Title I § 101 are expressly limited to "this title" (88 Stat. 634, see footnote 14, *supra*) and to "*Federal assistance provided in this title.*" (*Ibid.*) And the requirements set forth in Title I § 104 govern only grants made pursuant to Title I, § 106. 88 Stat. 638, 642, see footnote 15, *supra*.

■ Even if Title I § 101 is applicable, we do not find that the Victoria II commitment is contrary to the objectives set forth in Title I § 101. The plaintiffs erroneously interpret § 101 as imposing upon HUD an *absolute* duty to promote integrated housing, and draw from that supposedly absolute duty a corollary that HUD has committed too high a proportion of its housing assistance funds to projects in areas of minority concentration. § 101 imposes no such absolute duty. The "primary" objective stated in Title I of the Housing and Community Development Act of 1974 is the development of viable urban communities by providing "decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income." The promotion of integrated housing "through spatial deconcentration of housing opportunities" is a secondary objective. In any event, HUD is not bound to do more than to give serious consideration to the integrated housing objective. *Shannon v. HUD*, 436 F.2d 809, 822 (3rd Cir. 1970). Cf. *Strycker's Bay Neighborhood Council v. Karlen, supra*, 444 U.S. at 227–228, 100 S.Ct. at 500. Here HUD gave serious consideration to the availability of integrated housing "outside ghetto areas," and balanced the integrated housing which would be available against the proposed housing within the ghetto area. We are not authorized to overturn such "a fully informed and well-considered decision" even if it is not the decision we "would have reached had" we been decision makers at HUD. *Strycker's Bay Neighborhood Council v. Karlen, supra*, at p. 227, 100 S.Ct. at 500.

■ Nor do we find that the Victoria II commitment involves any possible violation of § 104(a)(4)(C)(ii), or of the regulation [16]

---

**15.** Title I, § 104(a)(4)(C)(ii) of the Housing and Community Development Act, 88 Stat. 638, 42 U.S.C. § 5304(a)(4)(C)(ii) provides:

Sec. 104. (a) No grant may be made *pursuant to section 106* unless an application shall have been submitted to the Secretary in which the applicant—..... (emphasis added)

(4) submits a housing assistance plan which—......

(C) indicates the general locations of proposed housing for lower-income persons, with the objective of ..... (ii) promoting greater choice of housing opportunities and avoiding undue concentrations of assisted persons in areas containing a high proportion of low-income persons

.  .  .  .  .

**16.** The HUD regulations which plaintiffs claim HUD has violated are subsections (c) and (d) of 24 C.F.R. § 880.206, formerly 24 C.F.R. § 800.-112(c) and (d), which provide:

§ 880.206 *Site and neighborhood standards.*
Proposed sites for new construction projects must be approved by HUD as meeting the following standards: .... (c) The site must not be located in:
(1) An area or minority concentration unless (i) sufficient, comparable opportunities exist for housing for minority families, in the income range to be served by the proposed project, outside areas of minority concentration, or (ii) the project is necessary to meet overriding housing needs which cannot otherwise feasibly be met in that housing market area. An "overriding need" may not serve as the basis for determining that a site is acceptable if the only reason the need cannot otherwise feasibly be met is that discrimination on the basis of race, color, religion, creed, sex, or national origin renders sites outside areas of minority concentration unavailable; or
(2) A racially mixed area if the project will cause a significant increase in the proportion

—subsection (d) of 24 C.F.R. § 800.112—adopted by HUD to effectuate § 104(a)(4)(C)(ii).

24 C.F.R. § 800.112(d), so far as here material, provides that a proposed site for a new construction project must "promote greater choice of housing opportunities and avoid undue concentration of assisted persons in areas containing a high proportion of low-income persons." Neither 24 C.F.R. Part 800 which relates to "Section 8 Housing Assistance Payments Program for New Construction" nor, so far as we have been informed, any other regulation defines "undue concentration." Nor has the national administration of HUD ever adopted a definition of "undue concentration." However, on January 24, 1977, in order *inter alia* to clarify and define the term "undue concentration," HUD in 42 Fed.Reg. 4299 published for comment regulations entitled "Site and Neighborhood Standards for Subsidized Housing." Section 200.704(a)(3) of those proposed but unadopted regulations provided as follows:

(3) *Whether a site is in an area of undue concentration of federally-assisted housing.* The area, as determined pursuant to paragraph (a)(1), of this section shall be determined to be an area of undue concentration of federally-assisted housing if a substantial number of the housing units in the area (generally over 40 percent) consist of housing (i) constructed, rehabilitated or purchased, leased (exclusive of units leased under the Section 8 Existing Housing Program (24 CFR Part 882) under the United States Housing Act of 1937 (42 U.S.C. 1437f)), Sections 221(d)(3) BMIR, 235, or 236 of the National Housing Act (12 U.S.C. 1715L(d)(3), 1715z and 1715z–1), Section 101 of the Housing and Urban Development Act of 1965, (12 U.S.C. 1701s), or Section 515 of the Housing Act of 1949 (42 U.S.C. 1485) and (ii) intended for occupancy by other than elderly households.

That proposed definition of "undue concentration," while perhaps helpful for analytical purposes, is not binding because it was not adopted.

In 1976 HUD's Boston Area Office appointed a Task Force to advise it, not the national HUD department, as to the meaning of the term "undue concentration." The Task Force recognized that it did not mean a single concentration percentage applied to all areas. It said that an "undue concentration" is "a level of concentration which will have a negative or unreasonable effect on the housing market." The Task Force proposed that if the percentage of assisted persons within an area was more than 150 per cent of assisted persons within the whole city there should be further investigation to determine whether this excess was undue. That proposal obviously has no binding effect.

Guided by the proposed January 24, 1977 HUD regulations and the Task Force recommendations, HUD found that there was not an *undue* concentration of assisted persons in the area where Victoria II is to be located. The definition proposed in the unadopted HUD regulations was met because, according to the then current figures, the percentage of assisted housing in the South End was between 38 and 39.4 per cent. The standards proposed by the Task Force were met because although the percentage of assisted persons in the South End was more than 150 per cent of the percentage of assisted persons in Boston, "the South End is an area of revitalization in which public and private investment is significant. Recent sample surveys of income levels show a continuing increase in income. In addition, data also show that mortgage lending activities and property values are steadily increasing in the area."

We conclude that HUD's finding that there was not, within the meaning of 24 C.F.R. § 800.206(d), an "undue concentration of assisted persons in the area" of the

---

of minority to non-minority residents in the area.

(d) The site must promote greater choice of housing opportunities and avoid undue

concentration of assisted persons in areas containing a high proportion of low-income persons.

**24**

proposed site of Victoria II was a finding supported by substantial evidence.

There remains for consideration the plaintiffs' contention that in its Victoria II commitment HUD violated 24 C.F.R. § 800.-112(c) recodified in 24 C.F.R. § 880.206(c). That subsection provides that "the site must not be located in (1) an area of minority concentration unless (i) sufficient comparable opportunities exist for housing for minority families in the income range to be served by the proposed project, outside areas of minority concentration . . ."

The parties agree that the Victoria II site is an area of minority concentration; the question is whether HUD had an adequate basis for concluding that "sufficient comparable opportunities" exist outside areas of minority concentration. With respect to that question the record shows that HUD, having analyzed its fiscal year 1977 funding decisions, determined that 511 units of comparable assisted housing had been funded in non-minority areas during that year while only 229 such units had been funded in minority areas, and concluded that "sufficient comparable housing opportunities do exist in non-minority areas to balance the funding of" Victoria II.

█ Despite plaintiffs' arguments to the contrary, we are satisfied that HUD was justified in taking into account those 511 units. They were reasonably expected to be completed earlier than Victoria II would be completed; when complete they will be in what recent census information showed were non-minority areas; and they were subject to restrictions which would make them available to Hispanic low-income families like those to be served by Victoria II. There is no merit to the plaintiffs' argument that HUD did not have a right to consider those 511 units because they had not yet been completed.

In short, the plaintiffs have not persuaded us that in committing funds to the Victoria II project HUD has violated any regulation or statute.

*Affirmed.*