**PROJECT B.A.S.I.C., Plaintiff,**

v.

**Jack KEMP, Secretary of Housing and Urban Development, et al., Defendants.**

**Civ. A. No. 89–0248 P.**

United States District Court,
D. Rhode Island.

April 2, 1991.

Steven Fischbach and Judith Kaye, Rhode Island Legal Services, Providence, R.I., for plaintiffs.

Robert B. Mann, Mann & Mitchell, Providence, R.I., for plaintiffs Phoenix Griffin Group II, Ltd., LTG Const. Co. and Lloyd T. Griffin.

Everett Sammartino, Asst. U.S. Atty. U.S. Attorney's Office, Providence, R.I., Peter Kimm, Jr., and David J.P. Gross, U.S. Dept. of Justice, Civ. Div., Washington, D.C., for defendants HUD and Kemp.

Stephen J. Reid, Jr., Blish & Cavanagh Providence, R.I., for defendant Stephen O'Rourke, Housing Authority for City of Providence.

Kevin McHugh, Office of the City Sol., City of Providence, Providence, R.I., for defendant City of Providence.

Robert J. Cosentino, Providence, R.I., for defendant Providence Community Action Program (PRO–CAP).

## MEMORANDUM AND ORDER

PETTINE, Senior District Judge.

This suit was filed by the plaintiff, Project B.A.S.I.C., a tenants organization, challenging the demolition of the Hartford Park Housing Project, the plan for scattered-site replacement housing and the location of a homeless shelter. In an earlier decision, this Court denied plaintiff's motion to enjoin the demolition and established a timetable for the completion of the replacement housing. *Project B.A.S.I.C. v. Kemp,* 721 F.Supp. 1501 (D.R.I.1989).[1] The issues remaining in the case are plaintiff's challenge to the location of the scattered site housing and the issues surrounding the homeless shelter.

The federal defendants, Secretary Jack Kemp and the Department of Housing and Urban Development (collectively, "HUD"), and the local defendants, Steven J. O'Rourke, Director of the Housing Authority of the City of Providence, and the Housing Authority itself (collectively, "PHA"), have each moved for summary judgment. HUD's motion addresses the only issue in-

---

1. The denial of injunction was affirmed in *Project B.A.S.I.C. v. Kemp,* No. 89–1910, 1st Cir., Oct. 5, 1989. The legal basis for the timetable was rejected by the First Circuit, although alter- nate grounds were suggested, in *Project B.A.S.I.C. v. O'Rourke,* 907 F.2d 1242 (1st Cir. 1990). The established timetable remains in effect.

volving HUD: its liability under the Fair Housing Act (or "Title VIII"), 42 U.S.C. § 3608, for its conduct in approving the location of the scattered site housing, reviewable under the Administrative Procedure Act, 5 U.S.C. § 701 et seq. ("APA"). PHA moves for partial summary judgment on the issue of its role in the siting of the replacement housing under the Fair Housing Act, 42 U.S.C. § 3601 et seq., Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., and the equal protection and due process clauses of the fourteenth amendment.

On a motion for summary judgment, Fed.R.Civ.P. 56 requires "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law[.]" *Hebert v. Mohawk Rubber Co.*, 872 F.2d 1104, 1106 (1st Cir.1989). When a party moves for summary judgment, it must "put the ball in play, averring 'an absence of evidence to support the nonmoving party's case.'" *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir.1990) (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986)). Once the movant has done so, the burden shifts to the nonmoving party to "establish the existence of at least one fact issue which is both 'genuine' and 'material.'" *Id.* A court must construe all factual inferences in the nonmoving party's favor. *Voccio v. General Signal Corp.*, 732 F.Supp. 292, 294 (D.R.I.1990). On the basis of this standard and the foregoing reasons, the defendants' motions for summary judgment are denied.

## I. *Factual Background*

The facts relating to the demolition of the high-rises at Hartford Park are set out in *Project B.A.S.I.C.*, 721 F.Supp. 1501, and I will not repeat them here except to say that it was the demolition of the subsidized housing there that led to the need for the 240 units of replacement housing now at issue. Constructing the replacement housing is a joint effort by HUD and PHA. For this project, HUD approved PHA's use of the "turnkey" method. Under the turnkey method, PHA advertises for and selects developers who submit proposals for sites owned by or to be purchased by the developer. 24 C.F.R. § 941.102(b). PHA then submits the sites for preliminary review to the HUD field office. *Id.* If HUD determines that the proposed sites comply with applicable standards, the developer prepares design and construction documents which both the PHA and the HUD field office review and approve. Following such approval, PHA and HUD enter into a contract under which HUD provides financial assistance to the PHA and the PHA promises to comply with HUD requirements relating to the development and operation of the project. The developer and PHA enter into a contract of sale which is approved by the HUD field office. Upon completion of the project, PHA purchases the project.

The PHA received funds from HUD in two separate allocations, in September 1987 and September 1988. In April 1989, PHA began to submit specific sites for HUD review. HUD's review is governed by various statutory provisions, including the Fair Housing Act, as well as HUD's own regulations and guidelines. The basic criteria for the review is set forth in HUD's Site and Neighborhood Standards, 24 C.F.R. § 941.-202. The requirements include adequate access to utilities and service streets; access to schools, recreational and health facilities and job opportunities, and a lack of adverse environmental conditions. *Id.* Most significant for our purposes is that the regulations also provide that sites for new construction must not be located in an area of minority concentration unless 1) sufficient, comparable opportunities exist for housing for minority families, in the range to be served by the proposed project, outside areas of minority concentration or 2) the project is necessary to meet overriding housing needs. *Id.* New construction also may not be located in a racially mixed area if the project will cause a significant increase in the proportion of minority to non-minority residents in the area and must avoid undue concentration of assisted persons in areas containing a high proportion of low income persons. *Id.* Moreover, HUD is constrained by 42 U.S.C.

§ 1436b which mandates that sites not be excluded from consideration "solely because the site proposed is located within [a minority] impacted area."

After PHA began submitting specific sites, HUD decided that under their regulations it would be permissible for PHA to site up to half of the replacement units in areas of minority concentration. HUD defined "areas of minority concentration" as census tracts in Providence with minority populations greater than 21.5% according to the 1980 census.[2]

As of February 1, 1991, the status of the 240 units was as follows:

1. *131 Units:* HUD has given final approval and entered into contracts with the PHA. Of these 131 units, 71 are complete and under PHA ownership (including 67 that are already occupied); the remaining units are in various stages of construction.

2. *89 Units:* HUD has given initial site approval, but the developer packages have not yet been approved. For 23 of these units, HUD is currently reviewing developer packages.

3. *20 Units:* No sites have been selected.

Of the 220 units for which HUD already has provided either final approval or initial review (categories 1 and 2 above), 119 units are located in non-minority concentrated areas (as defined by HUD); the remaining 101 units are located in areas of minority concentration.

HUD contends that its actions must be upheld, as a matter of law, unless shown to be "arbitrary and capricious" under the APA. 5 U.S.C. § 706. It argues that this Court's review must be limited solely to the administrative record and that summary judgment is the only proper vehicle for resolving this case. PHA relies primarily on HUD's brief and contends that if HUD's approval was proper PHA cannot be liable. Basically, PHA argues that it is shielded by HUD's review. Plaintiff, conceding that the APA is the proper vehicle for reviewing the claim against HUD, contends that a trial is necessary because there are genuine issues of material fact in dispute.

## II. *HUD*

### A. APA Review

■ HUD and the plaintiff agree that the claim against HUD must be reviewed under the APA, 5 U.S.C. § 701 *et seq.* Section 702 provides that

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed or relief therein denied on the ground that it is against the United States or that the United States is an indispensable party.

The APA standard of review is set forth in Section 706(2)(A), (C): "[t]he reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" *or* "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right...."

HUD's contention with regard to the standard of review focuses primarily on the "arbitrary and capricious" aspect of Section 706 while neglecting the possibility of a direct statutory challenge under the APA. *See Cousins v. Sec'y of U.S. Dep't of Transportation,* 880 F.2d 603, 608 (1st Cir.1989) (en banc). HUD's emphasis on this particular aspect is not unusual.

Courts and litigants may typically refer to the first, "arbitrary, capricious" type of legal challenge, in a shorthand matter,

---

**2.** HUD fixed 21.5% as the proper figure because that figure represented the total minority population in Providence at the time of the 1980 census. Plaintiff contends that this figure is not appropriate. They argue that a figure of 15.6% should be used, as that represents the percentage of minority population in the census tract that housed the demolished Hartford Park project.

as an "APA challenge," and they may refer to the question whether the regulations violate a substantive statute as a challenge under the statute itself. But technically this latter challenge falls within the purview of the APA just as the former does. *Id.*

In this case, plaintiff is bringing a challenge directly under the Fair Housing Act (or "Title VIII"), 42 U.S.C. § 3608, which sets forth HUD's duty to "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter." *Id.* at § 3608(e)(5).

█ Even as a direct statutory challenge under the APA, as a threshold matter, agency action is not reviewable if it is "committed to agency discretion by law." 5 U.S.C. § 701(a)(1). In *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), a seminal case on the APA, the Supreme Court explained that this exemption is not applicable when there is "law to apply." *Id.* at 413, 91 S.Ct. at 822. The Court also discussed the standard of review under Section 706 and stated that the reviewing court is "to engage in a substantial inquiry." *Id.* at 415, 91 S.Ct. at 823. Furthermore, although an agency decision is entitled to "a presumption of regularity," such presumption does not "shield [the] action from a thorough, probing, in-depth review." *Id.* A reviewing court's first inquiry concerns whether the agency acted within the scope of its authority. *Id.* This first step involves defining the scope of the agency authority and determining whether the agency could reasonably believe it was acting within the scope of that authority. *Id.* at 415–16, 91 S.Ct. at 823–24. Next, a court must determine whether the actual decision made meets the standard set forth in Section 706. "To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 416, 91 S.Ct. at 824. A court may not, however, "substitute its judgment for that of the agency." *Id.*

In the context of a challenge under the Fair Housing Act, the First Circuit Court of Appeals has held that HUD's affirmative duty under the Fair Housing Act is not committed to agency discretion and is, therefore, reviewable under the APA. *NAACP v. Sec'y of HUD,* 817 F.2d 149, 151 (1st Cir.1987). The court found that the Fair Housing Act supplied sufficient standards; there was "law to apply." *Id.* at 158. The court also noted that although "HUD possesses broad discretionary powers to develop, award, and administer its grants and to decide the degree to which they can be shaped to help achieve Title VIII's goals," this "does not in itself mean that HUD is immune from review." *Id.* at 157. In other words, while HUD has discretion in carrying out its duty, the duty itself is not discretionary. *See Shannon v. HUD,* 436 F.2d 809, 819 (3rd Cir.1970) (HUD has discretion, but discretion must be exercised in favor of fair housing); *Jaimes v. Toledo Metropolitan Housing Authority,* 715 F.Supp. 835, 839 (N.D.Ohio 1989) (compliance with the Fair Housing Act is not discretionary).

### B. The Fair Housing Act

█ The basic inquiry with regard to HUD is whether HUD fulfilled its affirmative duty under the Fair Housing Act. This duty is more than simply a duty to refrain from discrimination; rather the Act "reflects the desire to have HUD use its grant programs to assist in ending discrimination and segregation, to the point where the supply of genuinely open housing increases." *NAACP,* 817 F.2d at 155.

█ The First Circuit Court of Appeals has established what is minimally required of HUD. HUD must consider the effect of its actions "on the racial and socio-economic composition of the surrounding area." *Id.* at 156.

And, the need for such consideration itself implies, at a minimum an obligation to assess negatively those aspects of a proposed cause of action that would further limit the supply of genuinely open housing and to assess positively those aspects of a proposed course of action

that would increase that supply. If HUD is doing so in any meaningful way, one would expect to see, over time, if not in any individual case, HUD activity that tends to increase, or at least, that does not significantly diminish, the supply of open housing. *Id.*

Moreover, the obligation does not end with a mere consideration of the proper factors. *NAACP v. Kemp,* 721 F.Supp. 361, 365, 67 (D.Mass.1989). "Action must be taken to fulfill, as much as possible, the goal of open, integrated residential housing patterns and to prevent the increase of segregation, in ghettos, of racial groups whose lack of opportunities the Act was designed to combat." *Otero v. New York City Housing Authority,* 484 F.2d 1122, 1134 (2d Cir.1973). This Court recognizes that desegregation is not the only goal of national housing policy. *See Shannon,* 436 F.2d at 822. HUD also has an obligation to generally meet low-income housing needs. *See Cole v. Lynn,* 389 F.Supp. 99, 102 (D.D.C.1975). This, however, does not mean that HUD can avoid its affirmative duty under the Fair Housing Act.

■ HUD has interpreted its obligation under the Fair Housing Act through regulations at 24 C.F.R. § 941.202. These regulations set forth the factors HUD uses to evaluate proposed sites. The provision at issue in this case concerns levels of minority concentration.

The site for new construction projects must not be located in [a]n area of minority concentration unless (i) sufficient, comparable opportunities exist for housing for minority families, in the income range to be served by the proposed project, outside areas of minority concentration, or (ii) the project is necessary to meet overriding housing needs which cannot otherwise be feasibly met in that housing market area. 24 C.F.R. § 941.202(c)(1).[3]

HUD's decision to allow PHA to site up to 50% of the replacement housing in areas of minority concentration, was premised on its determination that "sufficient, comparable opportunities" existed in non-minority areas of Providence. Plaintiff's expert challenges this assessment. In looking at his assertions alongside the administrative record, this Court finds that there is a genuine, material, factual issue in dispute which precludes summary judgment.[4]

This Court does not find it necessary at this time to delve into the specific contours of HUD's duty. It would be more appropriate to do so when the factual disputes are resolved and the issue has been fully briefed.[5]

### C. The Administrative Record

■ HUD argues that this Court is not only barred from going beyond the administrative record, but that any sort of evidentiary hearing is also precluded. This Court agrees that the primary focus of its inquiry must be the administrative record. *See Overton Park,* 401 U.S. at 419, 91 S.Ct. at 825. "The fact that review sometimes or often focuses on the initial administrative record [however] does not mean it must, or always, will do so." *Valley Citizens for a Safe Environment v. Aldridge,* 886 F.2d 458, 460 (1st Cir.1989). A case may raise genuine issues of material fact that require a trial. *Id.* "[A] reviewing court might want additional testimony by experts, simply to help it understand matters in the agency record; indeed, it might ask for additional factual evidence as an

---

**3.** Some other factors that HUD considers are access to utilities, adverse environmental conditions, access to social, recreational, educational, commercial, and health facilities and job opportunities. 24 C.F.R. § 941.202.

**4.** HUD suggests that this Court should be guided by *Aertsen v. Landrieu,* 637 F.2d 12 (1st Cir. 1980). In *Aertsen,* there was evidence that 229 units in minority concentrated areas were offset by 511 units in non minority concentrated areas. *Id.* at 24. In the instant case, the evidence on comparable housing is not so clear and the

contrast in numbers not so great; *Aertsen,* therefore, is not dispositive.

**5.** At this stage in the litigation, the parties have not fully briefed the Fair Housing Act issue. HUD's primary argument on summary judgment has revolved around the standard of review under the APA. The plaintiff, on the other hand, has focused on whether there is a factual dispute that would preclude summary judgment.

aid to understanding." *Id.* The use of such experts is within a district court's discretion. *Id.* Moreover, "[t]he court may require the administrative officials who participated in the decision to give testimony explaining their action." *Overton Park,* 401 U.S. at 420, 91 S.Ct. at 428. In sum, this Court does not feel constrained to limit itself to summary judgment. The parties will, therefore, be allowed, in relation to the HUD claims, to present testimony from experts and agency officials.[6]

## III. *PHA*

The issue for the PHA is whether its role in the siting of the replacement housing violates the Fair Housing Act, 42 U.S.C. § 3601 *et seq,* Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and the equal protection and due process clauses of the fourteenth amendment. PHA contends its role is so intertwined with that of HUD that its liability is conditioned on HUD's liability. This Court, however, does not agree. HUD's approval of a site, even if that approval is lawful, does not shield the PHA from liability if it has unlawfully discriminated in selecting sites. *U.S. v. Yonkers Board of Education,* 624 F.Supp. 1276, 1374–75 (S.D.N.Y.1985), *aff'd,* 837 F.2d 1181 (2d Cir.1987), *cert. denied,* 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988).[7] One important consequence of reviewing PHA's liability separately is that PHA's actions do not implicate the APA because PHA is not an agency of the federal government. The review, therefore, is direct and goes well beyond the administrative record.

The review focuses on whether PHA has intentionally discriminated in the site selection process. The factors to be considered in such a case include "the degree of any discriminatory effect; the historical background of the actions; the specific sequence of events leading up to the actions; [and] the presence or absence of departures from normal procedures or substantive criteria." *Id.* at 1293 (citing *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266–68, 97 S.Ct. 555, 563–65, 50 L.Ed.2d 450 (1977)). Plaintiff has alleged intentional discrimination detailing a history of discrimination in PHA's handling of public housing and pointing to indications of discrimination in the present site selection process. For instance, plaintiff notes that in the PHA's initial replacement housing proposal, 180 out of the first 184 units were to be placed in areas of minority concentration. In so doing, plaintiff has met its burden of demonstrating that material, factual disputes exist. Summary judgment is, therefore, denied.

## IV. *Remedy*

In denying summary judgment, I do not wish to mislead any of the parties. This Court has concerns about the relief that could be awarded if the plaintiff should prevail. This Court "faces the difficult task of avoiding both remedies that may be too intrusive, interfering with HUD's ability to carry out its basic grant-awarding mission, and those that may prove to be ineffective." *NAACP,* 817 F.2d at 159. The APA "does not ordinarily empower a court to order an agency to fund particular projects or to reach particular results." *Id.* at 160.[8] This is not to say that this Court could not fashion a remedy. I can set aside unlawful agency actions and create other comparable remedies. *Id.* I choose to express these reservations now, as I have in the past, because of my belief that settlement could accomplish far more

---

6. With regard to the propriety of a trial, this Court notes that other cases against HUD have involved evidentiary proceedings. In these cases, the Courts of Appeals, in discussing the APA, did not indicate that these trials were improper. *See NAACP,* 817 F.2d at 151; *Alschuler v. HUD,* 515 F.Supp. 1212, 1216 (N.D.Ill. 1981), *aff'd,* 686 F.2d 472 (7th Cir.1982).

7. PHA argues that *Yonkers* is inapplicable because HUD was no longer in the case when the City of Yonkers' liability was determined. This Court, however, is not persuaded that this distinction is significant.

8. Although PHA and HUD each stand on their own in terms of liability, the fact that funding comes through HUD continues to have an effect on the remedy that this Court can fashion.

than litigation. Once again, I urge the parties to make as their priority the needs of the people of Providence who await the replacement housing.

*Order*

It is hereby, ordered that the defendants' motions for summary judgment are denied.