**PROJECT B.A.S.I.C.**

v.

**Jack F. KEMP, in his capacity as Secretary of the United States Department of Housing and Urban Development; the United States Department of Housing and Urban Development; Stephen J. O'Rourke, in his official capacity as Executive Director of the Housing Authority of the City of Providence; the Housing Authority of the City of Providence; the City of Providence; and the Providence Community Action Program, Inc.**

**Civ. A. No. 89–0248 P.**

United States District Court, D. Rhode Island.

July 17, 1989.

Steven Fischbach, R.I. Legal Services, Inc., Providence, R.I., John Dineen, R.I. Legal Services, Inc., Woonsocket, R.I., for plaintiff.

Mona Butler, U.S. Dept. of Justice, Washington, D.C., Ellen Dole, U.S. Dept. of HUD, Boston, Mass., Suzanne Curt, Asst. U.S. Atty., Providence, R.I., for Kemp & U.S. Dept. of Housing & Urban Development.

Stephen J. Reid, Jr., Providence, R.I., for O'Rourke and Housing Authority City of Providence.

Edward Clifton, City Sol. City of Providence, Robert J. Cosentino, Providence, R.I., for City of Providence and Providence Community Action.

## OPINION AND ORDER

PETTINE, Senior District Judge.

The Providence Housing Authority (hereinafter, "PHA"), a defendant in this action, operates the Hartford Park housing project, consisting of 748 apartments in the City of Providence. The plaintiff, Project B.A.S.I.C., is an unincorporated association of tenants and housing advocates in the City of Providence, including low-income and minority persons who are themselves residents of the Hartford Park housing project. The defendants are: the United States Department of Housing and Urban Development (hereinafter, "HUD") and Jack F. Kemp in his capacity as Secretary of HUD (together, "the federal defendants"); the Housing Authority of the City of Providence (hereinafter, "the PHA") and Stephen J. O'Rourke in his capacity as the Executive Director of the PHA (together, "the PHA defendants"); the City of Providence; and the Providence Community Action Program. In the instant action, plaintiff challenges the proposed demolition of three high-rise apartment towers at Hartford Park which together contain 240 units and the proposed construction of replacement housing on "scattered sites" in the City of Providence, as violative of the United States Housing Act, the federal Fair Housing Act and the National Environmental Policy Act. Plaintiff also challenges the decision changing the site of a shelter for the homeless from the Elmwood area of Providence to Hartford Park as violative of the federal Fair Housing Act. Plaintiff filed a motion for a temporary restraining order and preliminary injunction of the demolition on April 20, 1989. Plaintiff has alleged an organizational injury, causation and redressability in this action sufficient to find that it has standing. *See Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982); *Project Basic Tenants Union v. Rhode Island Housing and Mortgage Finance Corp.,* 636 F.Supp. 1453 (D.R.I.1986) (analysis of constitutional standing of unincorporated association).

This Court granted a temporary restraining order on April 21, 1989, prohibiting defendants from taking any further steps to demolish the three high-rise buildings slated for demolition. This order was subsequently modified by an order allowing defendant Providence Housing Authority to demolish the high-rise building at 375 Hartford Avenue, after a hearing at which the defendants presented an expert witness who testified that the building had been structurally damaged by preparation for demolition and was not safe.[1] The demoli-

1. 375 Hartford Avenue has been demolished. However, I will continue to refer in this Opinion to demolition of *three* high-rise buildings

tion preparation work had not progressed as far on the other two towers, 12 Bodell Avenue and 22 Whelan Road, and no party alleges that these two buildings are now structurally unsound.

The federal defendants have moved this Court to dismiss the action for lack of subject matter jurisdiction, under Fed.R. Civ.P. 12(b)(1), and for failure to state a claim upon which relief can be granted, under Rule 12(b)(6). In the alternative, the federal defendants moved for summary judgment. The PHA defendants joined these motions. Because I find that this Court does have jurisdiction over the subject matter, pursuant to 28 U.S.C. Section 1331, and that plaintiff has stated a cognizable claim, the motion to dismiss is denied. I will therefore consider only defendants' alternative motion for summary judgment.

At a hearing held on June 6, 1989, the parties agreed to submit memoranda addressing the merits of the issues presented and agreed that Plaintiff's Motion for Preliminary Injunction and Defendants' Motion to Dismiss or Alternatively for Summary Judgment would be consolidated for decision. This Opinion should be understood as disposing of all pending motions in this action, except as to the siting of the shelter for the homeless, which is expressly reserved for later decision.

## FACTS

The defendant PHA applied to HUD for federal funds through the Comprehensive Improvement Assistance Program (hereinafter "CIAP") to modernize the housing units at Hartford Park, including the 240 at issue here, and Manton Heights, another housing project operated by the PHA. It filed a Preliminary Application on March 20, 1987. The cover letter from the PHA's Executive Director noted that "the enclosed application is based on the assumption that the proposed comprehensive modernization of each project will assure each project's long-term viability. The Authority expects to subsequently amend this pre-

liminary application to propose demolition of portions of Hartford Park as an alternative to modernization if it is determined that modernization will not assure its long-term viability."

The following month, the PHA submitted to HUD an application for the development of 360 units of public housing.[2] This request was predicated on the PHA's plan to demolish all four high-rises, containing a total of 360 units, at Hartford Park: 375 Hartford Avenue (60 apartments), 12 Bodell Avenue (90 apartments), 22 Whelan Road (90 apartments) and 10 Whelan Road (120 apartments). The application included a "Statement of Intent to Make Application for the Demolition of Public Housing Units," specifically the four high-rise structures, as an alternative to their rehabilitation if it was determined that they would not be viable even if rehabilitated. The Authority reported that it had contracted with a private consultant, the McHenry Co., Inc., for a physical needs assessment which would analyze the viability of all PHA projects in need of modernization and estimate the cost of comprehensive modernization and demolition at Hartford Park. In the "Statement of Intent," the PHA evaluated the viability of the buildings according to the criteria of the Code of Federal Regulations (hereinafter, "C.F.R."). It was clear from this evaluation that the PHA had already decided that the high-rises were not viable. The PHA stated that, pursuant to 24 C.F.R. 970.6(a) and (b), the four high-rise buildings were obsolete and no reasonable program of modifications was feasible to return these buildings to useful life. In addition, the PHA stated that "the demolition of only parts of Hartford Park will help assure the useful life of the remaining portions of the project (e.g. it will reduce project density)," parroting the words of 24 C.F.R. 970.6(c).

On June 11, 1987, the PHA submitted a revised CIAP Fiscal Year 1987 Preliminary Application, still requesting funds for the

---

because plaintiff's challenge is to the validity of the entire demolition plan.

**2.** In response, HUD reserved $14,531,872 for 184 units of public housing on September 30, 1987.

modernization of all housing units at Manton Heights and Hartford Park, including the four high-rise buildings, and again noting that the application was based on the assumption that the proposed comprehensive modernization of each project would assure each project's long-term viability. In the attached letter, the PHA stated that it would withdraw the request for funds for modernization of the Hartford Park high-rises *not* if it was determined that modernization would not assure the project's long-term viability (the condition stated in the previous application) but rather "if the Authority's development application is approved." Attached to the application was a Project Viability Test, in which the PHA noted certain problems as to physical condition and unspecified "other factors", but recited that these problems would be solved by modernization; for example, the PHA checked "YES" as the answer to the statement: "After proposed modernization, the project will be suitable for operation as public housing in accordance with program standards for a period of at least 20 years."

Contrary to these assertions that modernization would restore the viability of the high-rises was the resolution passed eight days earlier by the PHA Board of Commissioners. In Resolution 3649, the Board adopted the plan to demolish three of the high rises and rehabilitate 10 Whelan Road. It was this demolition plan which was pursued.

The PHA submitted its final Application for Major Reconstruction of Hartford Park on August 20, 1987. The PHA therein sought a total of $16,647,596 for the modernization, including $2,079,000 for the demolition of three high-rise buildings.

The HUD Field Office in Providence recommended approval of the application, despite the Field Office's finding that the PHA had minimal management capability and minimal modernization capability. In a one-page analysis of the factors contributing to project obsolescence, the Field Office set forth a short history of Hartford Park, commenting that these three high-rises contain 240 units, each unit having two floors and an interior stairway. The buildings were originally designed for family occupancy, but proved inappropriate for family use; the PHA began in 1971 to use them for elderly housing. However, as maintenance and security at Hartford Park deteriorated, the high-rises began to experience significant vacancy rates. In 1982, HUD granted the PHA's request for a waiver to allow occupancy by persons under 62 years old, but vacancies continued to increase. The analysis concluded:

As of May 1987, only 86 of the 360 high rise units, or 24% were occupied. A total of 274, or 76%, are vacant. Despite the critical need for decent, affordable housing in Providence, waiting list applicants continue to reject offers of high-rise units at Hartford Park and indicate that they prefer other sites. Over 35% of all such offers were rejected by applicants last year. It is clear that a certain degree of the market resistance is a reaction to the project's maintenance and security problems. However, we would anticipate serious questions regarding the viability of the three high-rise buildings containing two-story units. Their interior stairways and overall design do not offer a desirable living environment for elderly residents. Conversion to family use would exacerbate the project's density problems. At its current level of 748 units, Hartford Park is by far the largest concentration of subsidized housing in Rhode Island. Conversion of the 240 two-story high-rise units to family use would result in a concentration of low income families that would pose a challenge to even the most capable property managers, particularly given the design of the units.

Accordingly, we do not believe that, even after renovation, these three buildings are suitable for continued use as public housing, either for family or elderly use. Rather, we believe them to be obsolete and would recommend replacing them with units designed to meet Providence's critical need for decent, affordable large family housing.

As the Field Office report indicated, the problems of the high-rises were numerous

and stemmed from a variety of sources. In discussing the PHA's plan to replace the 240 units in the three high-rises slated for demolition with scattered-site housing and the proposed modernization of the 388 units in low-rise buildings and 120 one-story units in 10 Whelan Road, the Field Office stated: "This approach addresses the Hartford Park development's two major design problems—the chronically vacant two-story high-rise units and the overconcentration of public housing on a single site."

On September 10, 1987, the Manager of HUD's Providence Field Office wrote to the Executive Director of the PHA, informing him that HUD had reserved $16,700,000 for the Hartford Park work, including the demolition of three high-rises. A Modernization Project Grant amendment to the PHA's Annual Contributions Contract was executed, listing "9–30–87" as the "Date of Modernization Grant Reservation."

The PHA's Board of Commissioners, on September 24, 1987, passed Resolution 3672. In this resolution, the Board approved the Authority's application for the demolition of 240 units of public housing in the three high-rises, but also resolved that "no such demolition shall be carried out until the Authority has received any and all necessary funding and approval to commence construction of an equivalent number of new, scattered site, replacement units."

The PHA submitted an application to HUD on September 29, 1987 for approval to demolish three high-rise buildings at Hartford Park. The PHA stated that it had "determined that a comprehensive program of modernization can not assure the long term viability of three of the Project's high-rise structures" and was therefore requesting HUD's permission to demolish the 240 units. The PHA specified that demolition of these buildings was in accord with the criteria listed in 24 C.F.R. 970.6(a) and 24 C.F.R. 970.6(b). The demolition also satisfied 24 C.F.R. 970.6(c), according to the PHA: "Lastly, the demolition of only parts of Hartford Park will help assure the useful life of the remaining portions of the project (i.e. it will reduce project density

and substantially reduce the project's overall vacancy rate)."

On November 27, 1987, the HUD Field Office replied to the PHA's demolition application. The letter stated that certain requirements of HUD's Public Housing Demolition, Disposition and Conversion Handbook (hereinafter, "HUD Handbook") were not met and that the application appeared deficient in several respects, including the plan for relocation of tenants and the report of tenant consultation.

The PHA submitted a revised application for demolition of the Hartford Park high-rises on January 20, 1988 to address the concerns raised by the HUD Field Office. This application included a timetable for demolition and construction of replacement housing, and a schedule for Hartford Park modernization work. The PHA stated as its plan to complete all construction of the replacement housing and to begin the modernization work at Hartford Park *prior* to the demolition of the towers.

The PHA also submitted a narrative entitled "Proposed Demolition Criteria" which was "based on criteria specified in part 970 of Title 24 of the Code of Federal Regulations." The PHA cited Sections 970.6(a)(3), (b) and (c) as the criteria which the project met. Although the various portions of the narrative were not designated by criterion, it appears that the PHA was claiming that the buildings were obsolete as to factors other than physical condition and location. Per Section 970.6(a)(3), major problems indicative of obsolescence include "factors which have seriously affected the marketability, usefulness or management of the property." The factors cited by the PHA included the following:

—design of the buildings makes them inappropriate for households with children;

—the number of building entrances are difficult and expensive to monitor, and lead to vandalism of vacant and occupied apartments;

—the "resulting conditions" place an immense financial burden on the PHA, which has an adverse effect on services and funding to other PHA projects.

As to the criterion of 970.6(b), "No reasonable program of modifications is feasible to return the project or portion of the project to useful life", the PHA cited these factors:

—the cost to renovate the high rise units is substantially higher than the cost to renovate the low rise units;

—the high rise structures will require substantially more long-term maintenance and repair, especially in common areas;

—the height and high density of the buildings contribute to their institutional character and high rates of vacancy, deterioration, and crime.

As to the criterion of Section 970.6(c), "In the case of demolition of only a portion of a project, the demolition will help to assure the useful life of the remaining portion of the project (e.g., to reduce project density)", the PHA stated:

The demolition of the three towers will result in helping to assure the useful life of the remainder of Hartford Park. The savings of staffing, management, excessive maintenance and decreased criminal activity will enhance the quality of life for the remaining 508 households, for without the three towers as a detrimental catalyst, the financial, physical, and social environment will be substantially enhanced.

On January 28, 1988, HUD's Providence Field Office recommended to John Mongan, the HUD Regional Administrator, that the PHA's application to demolish the Hartford Park high-rises be approved. On January 29, 1988, Mongan requested approval of the demolition application from James E. Baugh, General Deputy Assistant Secretary for Public and Indian Housing. This request included a finding by the Regional Office of Public Housing that the demolition was "in compliance with 24 C.F.R. 970, with the notations made by the Providence Field Office memorandum dated January 28, 1988."

The demolition plan was approved by HUD headquarters on February 4, 1988. A letter conveying this approval was sent by Baugh, General Deputy Assistant Secre-

tary, to Mongan, Regional Administrator, on February 4, 1988. The project approved at this time was "the rehabilitation of the remaining units and the replacement of units with 184 new public housing units and 120 vouchers."

The PHA submitted a separate application, on July 20, 1988, for funding for 56 additional scattered site public housing units to replace the units which would be lost as a result of the approved demolition at Hartford Park. The Fair Housing/Equal Opportunity Division of HUD's Regional Office reviewed the application which it found "approvable" on the condition that "areas of non-minority concentration are utilized." HUD reserved $4,762,-800 on September 28, 1988 for the construction of the additional 56 units of public housing.

Plaintiff has asked this Court to enjoin HUD and the PHA from taking further steps toward demolition of the Hartford Park high-rises, unless and until HUD and the PHA have satisfied all the statutory requirements for demolition under the U.S. Housing Act, 42 U.S.C. Section 1437p. The plaintiff also alleges that the PHA and HUD have failed to comply with other procedural requirements, including those of the National Environmental Protection Act and the Fair Housing Act, in their actions related to the demolition of the buildings and the construction of replacement housing.

## THE APPLICABLE LAW

■ In the First Circuit, a plaintiff must satisfy four criteria in order to be entitled to a preliminary injunction. The Court must find: (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction. *Planned Parenthood League of Massachusetts v. Bellotti,* 641 F.2d 1006, 1009 (1981).

In reviewing the plaintiff's request for a preliminary injunction of the demolition, I must determine whether plaintiff has demonstrated a likelihood of success on the merits. In this action, that determination turns on whether the PHA or HUD violated the law. But first, I must determine what law is applicable. The statute governing the demolition and disposition of public housing is 42 U.S.C. Section 1437p. This statute was amended on February 5, 1988 by Section 121 of the Housing and Community Development Act of 1987 (hereinafter, "HCDA"). The amendment made certain changes in the statute's subsections (b) and (d) which pertain to the instant action.

Defendants claim that Section 121 of the HCDA does not apply to demolition proposals that HUD approved before the HCDA went into effect. They cite a rule of statutory construction to the effect that a statute should not be interpreted as having retrospective operation unless the legislature has manifestly expressed its intention to make that statute retroactive. The plaintiff argues that the statute as amended by Section 121 is applicable, and presents the view of a co-sponsor of the HCDA, Representative Henry B. Gonzalez, Chairman of the House Subcommittee on Housing and Community Development, that public housing authorities and HUD must comply with the new statutory requirements before proceeding with any previously approved demolition. Letter of Rep. Gonzalez to Samuel Pierce, Secretary, Dep't of Housing and Urban Development, May 4, 1988, Plaintiff's Appendix, pp. 422–23.

■ I need not delve into this controversy, however, because I have determined that the meaning of the statute is plain on its face. Subsection (b) prohibits the Secretary of HUD from approving an application or furnishing assistance for demolition un-

less certain provisions are met. Therefore, I will judge the Secretary's compliance with subsection (b) according to that version of the statute which was in effect at the time the Secretary took the action of approving the application or furnishing assistance. HUD approved the application on February 4, 1988, prior to the enactment of the HCDA, so the approval must comply with the unamended statute.[3] As for what law applies to the Secretary's action of furnishing assistance, the parties do not agree on the meaning of the term "furnish assistance". Plaintiffs allege that HUD furnished assistance to the demolition after February 4, 1988 by beginning transfer of reserved funds to the PHA for demolition work, and that this action compels HUD's compliance with the amended statute. Defendants maintain that HUD furnished assistance to the demolition when it amended the Annual Contributions Contract on November 5, 1987 to fund the demolition and therefore needs only to comply with the unamended statute. I must adopt HUD's interpretation of the term because it is a permissible construction of the statute, under the standard of *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In sum, then, I will evaluate HUD's actions under the statute as it existed prior to the enactment of the HCDA.

As to the PHA, however, the current version of 42 U.S.C. Section 1437p expressly states, in subsection (d), Conditions for agency action: "A public housing agency shall not take any action to demolish or dispose of a public housing project or a portion of a public housing project without obtaining the approval of the Secretary and satisfying the conditions specified in subsections (a) and (b) of this section." This provision was added by the HCDA enacted February 5, 1989. By its terms, it prevents the Providence Housing Authority from de-

---

**3.** Plaintiff argues that HUD had not completed its approval by February 4, citing a letter sent by HUD's Providence Office on February 4 to the State's Historical Preservation Commission, requesting comments as to the effect the demolition would have on historical resources. Although this request does not comply with 36 CFR 800.3(c) in that HUD had not completed the analysis required by the National Historic Preservation Act *prior* to the approval of the expenditure, this non-compliance is harmless error, given that the demolition will not affect any historical resources.

molishing these high-rises unless the PHA has satisfied the conditions specified in subsections (a) and (b), regardless of the fact that the demolition was approved prior to February 5. Thus, I will look to the current versions of these subsections to evaluate the PHA's compliance.

## THE APPROVAL GRANTED BY THE FEDERAL DEFENDANTS

The plaintiff claims that "In order for HUD's approval to satisfy the statutory provisions ..., the demolition must be the *only* way to assure the long-term viability of Hartford Park, especially the 'remaining portion' of Hartford Park." It cites no support for this rule and research has uncovered none. The statute, 42 U.S.C. Section 1437p, merely requires that if only a portion of a project will be demolished, "the demolition will help to assure the useful life of the remaining portion of the project." The Secretary found that this partial demolition would in fact help to assure the useful life of the remaining portion of the project by reducing the project density.

In reviewing this agency decision, I apply the standard set forth in the Administrative Procedure Act, 5 U.S.C. Section 706:

The reviewing court shall ...

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ...

(D) without observance of procedure required by law....

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

If a rational basis exists to support the agency's action, then I cannot disturb that decision. *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 290, 95 S.Ct. 438, 444, 42 L.Ed.2d 447 (1974). The First Circuit explicated this standard recently in *Conserva-tion Law Foundation v. Secretary of the Interior*, 864 F.2d 954 (1989).

It is well-established that this standard of review is highly deferential, whereby the reviewing court presumes the agency action to be valid. (citations omitted).

It is important to note that this Court cannot substitute its own judgment for that of the agency. *Citizens to Protect Overton Park v. Volpe*, 401 U.S. [402] at 416, 91 S.Ct. [814] at 823–24 [28 L.Ed.2d 136 (1971)].... We cannot base our decision on what we would decide sitting in the place of the agency, but must determine whether the agency's decision can withstand the arbitrary and capricious challenge on review.

864 F.2d at 957–58.

I review HUD's approval in light of the information it had before it, the administrative record. HUD was presented with statements by the PHA that "density" was one of many problems of the high-rises:

The height of the buildings combined with the significantly higher density over the low rise structures, are factors which contribute to the institutional character of the family high rises. This tenant resentment has certainly been a factor in contributing to the high vacancy. Tenant preference is for low rise structures because of convenience, safety, defensibility of space, maintenance, and management factors. The density of two of the towers is 195 units per acre, or over thirteen times the density of the low rise[s]. The third tower is eight times the density of the low rise units.

Statistics from projects containing high density, high use structures, such as the Pruitt–Igoe complex in St. Louis and most recently, the Newark Housing Authority, has (sic) shown a direct correlation of building height and project density to vacancy rates and increased crime. Projects with buildings three stories in height or less typically can maintain vacancy rates under 10%. As density increases and buildings increase in height, vacancy rates climb dramatically. The PHA's statistics support the identical situation at Hartford Park.

Application for U.S. Department of Housing and Urban Development Approval of Public Housing Demolition, January 1988, Administrative Record, pp. 707–08.

■ The fact that partial demolition will always reduce project density is a given; however, the reduction of project density is not, by itself, enough to meet the criteria for demolition. The issue is whether the demolition, through the reduction in density, will help assure the useful life of the remaining portion of the project.

The PHA states that the project density of two of the buildings proposed for demolition is 195 units per acre, or over thirteen times the density of the low-rise buildings. This statistic is not very illuminating because there is no comparison attempted between this level of density and that of other neighborhoods in the City. The PHA reports that the high-rises are, not surprisingly, more dense than the low-rises, without reporting whether the high-rises are *too* dense. But the statute allows the use of such fatuous statistics as long as the Secretary can determine that the demolition will help to assure the useful life of the remaining portion of the project.

By linking greater height and density to higher vacancy rates and increased crime, the PHA provided some evidence which supports the PHA's statement and HUD's determination that the demolition of the buildings would help to assure the useful life of the remaining portion of the project. The PHA stated that "The savings of staffing, management, excessive maintenance and decreased criminal activity will enhance the quality of life for the remaining 508 households, for without the three towers as a detrimental catalyst, the financial, physical, and social environment will be substantially enhanced." *Id.* at 710.

This statement seems sensible, but very little is provided in the record to support it. Where are the statistics comparing the maintenance costs per unit for the high-rises versus the low-rises? Where is the data on the loci of criminal activity? Did the PHA consider the staffing and management which will be required by the scattered site replacement housing as compared to that required by the high-rises? This record is so devoid of pertinent facts, statistics, and comparisons that it is a close question as to whether the approval was arbitrary. That HUD can allow the PHA to demolish 240 units of needed housing on the record presented here is incredible to this Court. Yet this demolition is allowed under the current statutes and regulations.

The Secretary determined that the PHA's project satisfied the criterion of 42 U.S.C. Section 1437p(a)(1) in that "the partial demolition will reduce the project density and thereby help to assure the useful life of the remaining portion of the project." Under the law governing the demolition of public housing units, I do not find that this determination was arbitrary or capricious.

HUD was also required to comply with subsection (b) of the demolition statute, 42 U.S.C. Section 1437p, regarding consultation with tenants and relocation assistance:

The Secretary may not approve an application or furnish assistance under this section or under this chapter unless—

(1) the application from the public housing agency has been developed in consultation with tenants and tenant councils, if any, who will be affected by the demolition ... and contains a certification by appropriate local government officials that the proposed activity is consistent with the applicable housing assistance plan; and

(2) all tenants to be displaced as a result of the demolition ... will be given assistance by the public housing agency and are relocated to other decent, safe, sanitary, and affordable housing, which is, to the maximum extent practicable, housing of their choice, including housing assisted under section 1437f of this title.[4]

---

4. The quoted language is from the statute in effect on February 4, 1988, the date of HUD's official approval of the demolition. Section 121 of the Housing and Community Development Act, enacted February 5, 1988, amended this subsection (b) extensively, by adding a paragraph (3). The amended statute governs this Court's review, *infra,* of the actions of the PHA.

I have reviewed the administrative record to determine whether HUD complied with these provisions.

■ First, did the PHA develop its application in consultation with tenants and tenant councils? The PHA's Executive Director sent a memo on March 12, 1987, to all Tenant Association Presidents, informing them of its plans to submit an application to HUD for CIAP funds. The letter stated that, if approved, the CIAP funds "will be used for modernization and management improvements to promote the long-term physical and social viability of the Authority's public housing projects." The notice did not identify the projects to be modernized nor did it mention the possibility of demolition.

Plaintiff contacted the PHA and HUD in early April 1987, in response to newspaper articles discussing the possibility of demolishing the high-rise buildings at Hartford Park, asking that a public hearing on the proposed demolition be held. The manager of the Providence HUD office replied, saying that it was the responsibility of the local public housing authority to comply with the statutory requirements for public comment on such a proposal.

The PHA reported on consultation with tenants in the September 29, 1987 application for demolition approval:

The PHA has consulted with representatives of the Hartford Park Tenants' Association on an on-going basis regarding both the proposed modernization and demolition at the Hartford Park project.... The PHA's Board of Commissioners also established a modernization committee which includes representatives of the project and the project's Tenant Association. Tenants have also been afforded additional opportunities to comment on the PHA's proposal to undertake demolition during various public meetings of the PHA's Board of Commissioners.

On June 3, 1987, the Board of Commissioners of the PHA met. Rose Veiga, a member of the tenants' committee (also President of the Hartford Park Tenants Association), spoke in opposition to demolition of any building at Hartford Park. However, the Board passed Resolution 3649, resolving to demolish three of the four high-rise buildings at Hartford Park and rehabilitate the other high-rise, 10 Whelan Road.

Plaintiff again contacted the PHA by letter, on July 1, stating "for the record, Project BASIC is opposed to the Demolition of any of the Towers in Hartford Park. We stand by our request, letters to PHA and HUD (April 1 and 2) and the last PHA Board meeting of June 3, calling for a Public Hearing *before* any final decision is reached on the Towers. We stand firm in our position that a comprehensive planning process should be undertaken with the tenants and others interested in redesigning the Towers to meet the changing needs of families and the physical conditions of the buildings."

The PHA published a request for proposals on the potential use of the three towers on July 9, 1987. In response, plaintiff submitted a letter on July 13, urging that the PHA use the towers for public housing. The PHA's Executive Director acknowledged this correspondence by letter, stating "I want you to know up front that the PHA doesn't have plans to renovate or reuse the buildings for our own use." Finally, the PHA submitted an application for funds for major reconstruction of Hartford Park on August 20, 1987, including a request for $2,079,000 for the demolition of three buildings.

The Hartford Park Tenants Association prepared a "Demolition/New Construction Proposal" dated August 26, 1987. The proposal reflected the Association's position that: "With the proper Management, Maintenance and Security plus additional funding we believe that the Hartford Park development could be made to be a decent, safe place for its residents." The Association then offered two options—one recommending no demolition of any Hartford Park building, the other recommending demolition of two high-rise buildings of 210 units (10 Whelan Road and 12 Bodell Avenue) and construction of 60 new units on the Hartford Park site.

Plaintiff points to its own opposition to the demolition as well as that of the Hartford Park Tenants Association, in support of its argument that the PHA did not comply with the tenant consultation requirement of 42 U.S.C. 1437p(b)(1). The federal and PHA defendants refer to the committee of tenants that was formed to meet with the PHA, the comments of a committee member at the PHA Board meeting in June, and the Hartford Park Tenants Association's alternative proposal of demolition of two high-rises. Although I do not find that the consultation with tenants was exemplary, especially in light of the fact that the PHA solicited very little of the input it received, it is true that the PHA had before it the views of those tenants and groups who opposed the demolition. What is unmistakably clear, however, is that the Board did not incorporate any of the suggestions of the demolition opponents into its application. It is rather striking that the defendants can only point to the alternative proposal of the Hartford Park Tenants Association, which suggested that two high-rises (one *not* slated for demolition by the PHA) be demolished, as the point of congruence between the tenants' views and the PHA's plan. It is ludicrous to suggest that this proposal, submitted in late August 1987, was adopted in part by the PHA. The PHA's plan was already fully formulated, as shown by the fact that the PHA had earlier applied for funds for demolition of the three high-rises.

The PHA is to be faulted for its barebones, lackadaisical efforts to develop its application in consultation with tenants and tenant councils. However, based on the administrative record which indicates some effort to gain input from tenants, I do not find that the decision to approve the application despite the limited amount of tenant consultation was arbitrary or capricious.

■ In addition to tenant consultation, subsection (b)(1) of 42 U.S.C. Section 1437p also mandates that the application contain a certification by appropriate local government officials that the proposed activity is consistent with the applicable housing assistance plan. Attached to the PHA's Application for Approval of Demolition, submitted in January 1988, was a letter dated January 11, 1988 from Providence Mayor Joseph K. Paolino, containing this statement:

The demolition of three of the project's high-rise buildings will undoubtedly improve the long-term viability of the remainder of the project. At the same time, the development of the 240 new units of public housing on scattered sites throughout the City will support the City's efforts to upgrade its residential neighborhoods. We have committed substantial resources to the revitalization of our neighborhoods and your proposed demolition and development activities are in conformity with the City of Providence's Housing Assistance Plan.

Plaintiff suggests that this proposed demolition is not in compliance with the local Housing Assistance Plan, which states:

The City of Providence is committed to a general policy of not allowing the demolition of residential structures that are occupied or occupiable by low and moderate income families. The City now regularly boards its vacant and abandoned residential properties in an attempt to save them for future reuse. Currently, demolition of such properties is seldom done. Demolition is only allowed if a property is so structurally damaged that it presents a clear and present danger to the surrounding neighborhood.

Although the PHA's project encompasses demolition which seems to be prohibited by the Housing Assistance Plan, in that the two high-rise buildings slated for demolition are not structurally damaged at all, the statute does not require that HUD look beyond the certification of consistency with the HAP. Since that was provided, HUD's approval was reasonably granted.

■ It was also necessary for HUD to find that subsection (b)(2) of 42 U.S.C. Section 1437p, dealing with tenant relocation, had been satisfied in order to approve this application. The statute requires that "all tenants to be displaced as a result of the demolition ... will be given assistance by the public housing agency and are relocat-

ed to other decent, safe, sanitary, and affordable housing, which is, to the maximum extent practicable, housing of their choice...." The PHA stated in its September 1987 application for demolition that approximately "70 families" would be displaced as a result of the proposed demolition; by the time of the January 1988 application, that number had dropped to "38 households", presumably due to relocation in the interim. Of these 38, 32 are single person households. The PHA announced the following relocation plan:

> There are approximately 330 vacant units throughout all of the Hartford Park development, of which 124 are units not scheduled for demolition. The 32 single displaced tenants of the 3 highrise towers can be housed temporarily in the remaining high rise comprised of all one bedroom units. This tower, 10 Whelan Road, currently has 94 vacant units, so can easily accomodate the 32 tenants. The remaining 6 family households can also be relocated to any of the remaining 30 vacant units at Hartford Park.

Although the PHA did not expressly state that the relocation housing satisfies the description of "decent, safe, sanitary, and affordable housing", one could infer from the low vacancy rates of the low-rise buildings that this was the case. As to the relocation of tenants into 10 Whelan Road, the PHA knew and HUD was able to determine that the building was mostly vacant—94 vacant units in a building of 120 units means that only 26 apartments were occupied. A tower with such a high vacancy rate would be subject to all the pernicious conditions (vandalism of occupied and vacant units, institutional character, tenant resentment) listed by the PHA as requiring the demolition of the other three high-rises. However, by adding 32 households to the current number of tenants, 58 of the 120 units would be occupied, a higher percentage of occupancy than existed at the highrises slated for demolition. HUD approved the PHA's application with this relocation plan. Determining whether a certain housing plan is safe is a decision within HUD's area of expertise. This Court defers to the agency's determination of this issue.

It must be noted that the statement of "Relocation Resources and Costs" included in the January 1988 application was premised on an overall "modernization/new development/demolition strategy" which had a schedule showing that 50% of the new construction would be completed *before* the demolition contract was awarded. Based on this timetable, the PHA predicted that "when the modernization activities reach the point where demolition of the 3 towers is required, the new scattered site units will have already been completed to facilitate the final modernization activities of Hartford Park and provide the PHA with replacement housing for the scheduled demolition." For some reason, which is not documented in the administrative record of more than 1,000 pages nor adverted to by any defendant, the order of activities in the "modernization/new development/demolition strategy" was changed radically. The PHA is now determined to demolish these buildings as soon as possible, although modernization and new construction are not even underway. Therefore, the relocation plan submitted with the January 1988 application is no longer operative. However, it appeared viable at the time of HUD's approval.

Overall, then, HUD's approval of the demolition application submitted by the PHA on the basis of the criteria explicated in 42 U.S.C. Section 1437p was not unlawful, under the scope of review permitted this Court by 5 U.S.C. Section 706.

## THE CONDITIONS FOR PUBLIC HOUSING AGENCY ACTION

Turning now to PHA's compliance with 42 U.S.C. Section 1437p, a public housing agency is obligated, according to that statute's subsection (d), to satisfy the conditions specified in subsections (a) and (b).

I find that the PHA complied with the provisions of subsection (a), as to the criterion for demolition being that the demolition of only a portion of the project will help to assure the useful life of the remaining portion of the project, and subsection (b)(1), regarding the consultation with ten-

ants and the local government official's certification of consistency with the local housing assistance plan.

To determine whether the PHA has satisfied the conditions of subsection (b)(2) requires that this Court look beyond the administrative record. The PHA defendants stated in their Memorandum in Support of Defendants' Objection to Motion for Preliminary Injunction, filed May 30, 1983, that only three tenants were still living in the high-rises slated for demolition; plaintiff does not dispute this. All other displaced tenants have been relocated, it would appear, and plaintiff has not claimed that the relocation housing is not satisfactory. However, because the demolition is now planned to precede modernization and new construction, it is unclear where the PHA intends to house the Hartford Park tenants now living in the low-rises and in 10 Whelan Road during the period that those buildings are being modernized. Although the PHA has successfully relocated the households displaced by demolition for the present, I hasten to remind the PHA that it has a continuing obligation to provide these tenants with "decent, safe, sanitary, and affordable housing, which is, to the maximum extent practicable, housing of their choice." 42 U.S.C. Section 1437p(b)(2).

Because subsection (d) of 42 U.S.C. Section 1437p is formulated as a bar to a public housing agency's actions to demolish, I found, *supra*, that the PHA must comply with the conditions of the amended version of subsection (b), i.e., including the newly-added subsection (b)(3). Subsection (b)(3) requires that the PHA has developed a one-for-one replacement plan, providing for "an additional decent, safe, sanitary, and affordable dwelling unit for each public housing dwelling unit to be demolished." Specifically, the PHA's plan satisfies subsection (b)(3) in that it provides for such replacement dwelling units through its plan for construction of new units on scattered sites. The other relevant conditions set forth in subsection (b)(3) appear to be satisfied.

I must add one caveat. Subsection (b)(3)(D) requires that the public housing agency's one-for-one replacement plan include "a schedule for completing the plan within a period consistent with the size of the proposed demolition ..., except that the schedule shall in no event exceed 6 years." The schedule submitted by the PHA with its January application included a schedule which complied with this requirement. The PHA proposed, in its January 1988 application which was approved by HUD, that it would use the period from January 1, 1988 to October 15, 1989 to construct the 240 units of replacement housing. Construction was scheduled to begin on October 15, 1988. To date, construction has not begun.[5] In fact, HUD had not approved the PHA's partial list of sites for the replacement housing, as of May 30, 1989.[6] The step of identifying specific sites and preparing requests for proposals was scheduled to require seven months (January 1—August 1, 1988); the task had already taken fifteen months by April 1, 1989, and still was not complete as of that date. Obviously, the schedule submitted to HUD is out of date, but no up-to-date schedule has been presented.[7] In order to comply with the statute, therefore, the PHA must submit a schedule, with which it intends to abide, for completing the construction of the replacement hous-

---

5. Any suggestion that this litigation impeded construction is unavailing because the complaint was filed in April 1989, six months after construction was to have begun, according to the schedule. In fact, construction was to have begun even earlier than that: a January 28, 1988 memo from the Manager of the Providence HUD Office stated that "the time schedules for demolition, replacement housing, and modernization activities will be revised. [T]he Authority is in reality looking for construction and renovation starting this summer (1988)."

6. The federal defendants used this fact in support of their argument, discussed *infra*, that the issue of the scattered site housing is not ripe for adjudication at this time.

7. To be precise, the administrative record does not include a revised schedule nor has any party presented such schedule for the Court's information.

ing. The PHA received approval for this demolition on the basis of a schedule for all phases, identification of the sites to final project close-out, to be accomplished in 23 months (January 1, 1989 through December 1, 1989). I realize that the first step has already taken twice as long as scheduled and that this litigation may have caused these efforts to be suspended, but it is not unreasonable to require that the PHA live up to its representations to HUD, starting today.

It was on the basis of a 23–month construction schedule that the PHA was given permission by HUD to demolish the high-rises, and it is this schedule which must be followed. To require any lesser degree of compliance would be to make a mockery of the entire statutory scheme. It is inevitable that land prices and construction costs will increase; in the not too distant future, the millions of dollars which HUD has reserved for the PHA will not be enough to obtain the lots and build 240 units of housing. The PHA must move swiftly.

IT IS HEREBY ORDERED that the PHA proceed as soon as possible to begin construction of the 240 public housing units, funded by HUD, needed to replace the 240 units lost due to the past and planned demolition of the high-rises at Hartford Park. The PHA is ordered to complete construction of all 240 units of replacement housing within 23 months of the date of this Opinion.

### PLAINTIFF'S CLAIM OF NEPA VIOLATIONS

■ Plaintiff has alleged that the procedures used by HUD in assessing the environmental impact of the proposed demolition violate the National Environmental Policy Act of 1969 (hereinafter "NEPA"), codified at 42 U.S.C. Section 4321 et seq. HUD conducted an Environmental Assessment (hereinafter "EA") of the planned demolition which contained a "finding of no significant impact" (hereinafter "FONSI"). Plaintiff challenges this finding as incorrect and also claims that the EA was not a

good faith consideration of the environmental impact of the demolition.

The First Circuit has explicated the task of the district court in reviewing an agency decision subject to the requirements of NEPA as having two aspects:

First, the court makes a substantive review of the agency's action to determine if such action is arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C. Section 706. This substantive review, although conducted on the basis of the entire administrative record, is quite narrow in scope. The court should only assure itself that the agency has given good faith consideration to the environmental consequences of its actions and should not pass judgment on the balance struck by the agency among competing concerns (citation omitted).

Second, a reviewing court must assess the agency's compliance with the duties NEPA places upon it. These duties are "essentially procedural." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978).

*Grazing Fields Farm v. Goldschmidt*, 626 F.2d 1068, 1072 (1980).

I find, upon review of the administrative record, that HUD did give good faith consideration, albeit tardy, to the environmental consequences of its actions. I now turn to the issue of the agency's compliance with procedural duties imposed by NEPA.

24 C.F.R. 970.4 sets forth the general requirements for HUD approval of applications for demolition or disposition of public housing projects:

HUD will not approve an application for demolition or disposition unless: ...

(e) Demolition or disposition will meet the requirements of the National Environmental Policy Act of 1969, 42 U.S.C. 4321, the National Historic Preservation Act of 1966, 16 U.S.C. 469, and related laws, as stated in the Department's regulations at 24 C.F.R. Part 50.

24 C.F.R. Part 50 contains instructions that apply specifically to HUD programs, and is

to be used in conjunction with 40 C.F.R. Parts 1500–1508, the regulations which establish the basic procedural requirements for compliance with NEPA and are to be followed by all Federal agencies.

Pursuant to the regulations promulgated in Part 50, HUD made an evaluation of the environmental impact of the proposed demolition. Kantilal Patel, a general engineer with HUD's Providence office, conducted a field inspection of Hartford Park on February 3, 1988 and completed a form entitled "Environmental Assessment for Subdivision and Multifamily Projects," including his conclusion: a "finding of no significant impact."

Plaintiff claims that this finding is incorrect because "the FONSI was made without any explanation why the proposed demolition of the Hartford Park high-rises would not have a significant effect on the human environment," specifically the impact on the availability of public housing. That issue is directly addressed by the requirement of a one-for-one replacement plan, in 42 U.S.C. Section 1437p(b)(3). The loss of public housing units is simply not an element of consideration in an Environmental Assessment.

Plaintiff alleges that HUD should have prepared an environmental impact statement (hereinafter "EIS") on the proposed demolition because "HUD's approval of the demolition application was a major federal action significantly affecting the environment." This argument is without merit, however, because HUD was not required to prepare an EIS. An EIS is required if the EA indicates that the proposal has significant environmental impacts. 24 C.F.R. 50.-33(d). The EA here indicated that the proposal had no significant environmental impact; therefore, no EIS was required. Nor was this proposal among those which HUD has classified as "normally" requiring an EIS, such as a "proposal [which] would remove, demolish, convert or substantially rehabilitate 2,500 or more existing housing units...." 24 C.F.R. 50.42(b)(3).

HUD's environmental assessment was defective, according to plaintiff, because HUD failed to:

(1) incorporate the scattered-site plan in the EA;

(2) begin the NEPA process until a few days before the demolition application was approved;

(3) involve the plaintiff in the preparation of the EA and notify plaintiff of the availability of the FONSI.

As to the first objection, the federal defendants state, "No such assessment was required, however, as the environmental impact of the scattered site units is unrelated to that of the demolition. (citation omitted). Moreover, no such assessment could have been produced, as final site plans had not been established at the time of PHA's funding request—and indeed, still have not been established." Federal Defendants' Memorandum, filed May 30, 1988, p. 48. Although the environmental impact of the scattered site units is *separate* from the impact of the demolition, the two are clearly *related*. As the federal defendants stated only three pages earlier, "demolition was expressly linked to construction of replacement housing." *Id.*, p. 45. Because of this linkage, it would seem imperative to evaluate the environmental impact of the replacement housing in order to assess fully the impact of the demolition. And, if the final sites for replacement housing have not yet been determined, then it would seem necessary to withhold approval of the demolition until the total impact of the demolition and construction could be evaluated. But the regulations do not require this comprehensive evaluation, so HUD's inability to evaluate the related construction project in the context of this EA led to no prejudicial error.

As to the second objection, the federal defendants state that "The General Engineer who prepared the EA was thoroughly familiar with the project and the PHA's demolition plan.... His ability to complete the assessment promptly resulted from his prior knowledge of the site and the proposal. Moreover, the speed with which HUD was able to complete its analysis also indicates the lack of environmental impact from the proposed demolition."

The defendants are boasting about speed when they should be concerned about timing. HUD appears to have overlooked the NEPA requirement that "Agencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts." 40 C.F.R. 1501.2. The engineer who prepared the EA visited the site on February 3 and filed his report on February 4, the very day the demolition was approved. It appears that HUD waited until the very last moment to do a NEPA evaluation. Although I would not classify this non-compliance as merely a "trivial violation," [8] I find that no prejudicial error resulted.

I reach the same conclusion of no prejudicial error as to plaintiff's third objection, that HUD failed to involve plaintiff in the preparation of the EA and did not notify plaintiff of the availability of the FONSI.

In sum, I do not find HUD's approval unlawful on the grounds raised by plaintiff as to NEPA violations, under this review pursuant to 5 U.S.C. Section 706.

## THE RACIAL DISCRIMINATION CLAIMS

Plaintiff challenges the demolition and the scattered site plan for replacement housing as violative of the Fair Housing Act, 42 U.S.C. Section 3601 et seq., and the Civil Rights Act of 1964, 42 U.S.C. Section 2000a et seq.

I find the challenge to the demolition on these grounds to be without merit. Plaintiff's statistic, that racial minorities constituted 66% of tenants in PHA-operated, federally subsidized family housing in 1981,[9] might be useful in establishing that demolition without replacement housing would have a disproportionate impact on minority persons. However, the plan here is not for demolition alone; the demolition is to be compensated for by the construction of replacement housing.

The challenge to the scattered site plan is not ripe for adjudication at this time. As the plaintiff concedes, "Neither HUD nor the City of Providence has approved the sites for the location of either the 184 or 56 units of scattered site public housing." That being so, the controversy is hypothetical and cannot now be heard. *See United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947).

■ However, plaintiff's claim has raised an important issue. If plaintiff's fears that "the proposal to demolish buildings at Hartford Park and the PHA's proposed scattered site housing will both exacerbate the residential segregation in the city and will disproportionately harm minority residents" are well-founded, defendants should reconsider the plan now. Will the PHA be able to locate a sufficient number of lots in appropriate areas, in accord with the Fair Housing Act, the Civil Rights Act, and the Fair Housing/Equal Opportunity Division's condition that the 56 units funded on September 28, 1988 be sited in areas of non-minority concentration, on which to build 240 units of public housing? If defendants determine that the PHA will not be able to do so, the PHA should, on its own or by order of HUD, cease demolition of those units which it cannot replace. The citizens of Providence are entitled to equate the demolition of the high-rises with the PHA's promise that it can and will build the 240 units of replacement housing.

## THE PROPOSAL FOR A SHELTER FOR THE HOMELESS

The plaintiff alleged in its Complaint that certain defendants, namely the City of Providence and the Providence Community Action Program, violated plaintiff's rights under the Fair Housing Act of 1968 with regard to plans for a shelter for homeless

---

8. According to 40 C.F.R. 1500.3, "It is the Council [on Environmental Quality's] intention that any trivial violation of these [NEPA] regulations not give rise to any independent cause of action."

9. *See* Plaintiff's Objection to Federal Defendants' Motion to Dismiss or Alternatively for Summary Judgment, filed June 14, 1989, p. 40.

persons to be built in Providence. The defendant, Providence Community Action Program, filed a motion to dismiss on May 30, 1989, to which plaintiff objected on July 7, 1989.

This claim is unrelated to the claims challenging the demolition and scattered site housing decisions, so it can be decided separately. Adjudication of plaintiff's claims regarding the proposed shelter must await submission of legal memoranda.

IT IS HEREBY ORDERED that plaintiff should submit a memorandum of law on September 15, 1989, which must include specific allegations as to which statutes it believes have been violated. Defendants in this cause of action, the City of Providence and the Providence Community Action Program, should submit any reply memoranda by September 29, 1989.

## CONCLUSION

In accord with the above analysis, I find that plaintiff has not demonstrated a likelihood of success on the merits of its challenge to the actions of the PHA and HUD. Therefore, plaintiff's motion for an injunction against the demolition of high-rise buildings at the Hartford Park housing project and for other injunctive relief is DENIED.

Defendants' motion for summary judgment is PASSED.